STATE *v.* ELROY KENT.

October Term, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed November 12, 1909.

*Criminal   Law—Evidence—Comparison   of · Handwriting—
Carved  Inscription—Comparison  with  Writings—Identifi-
cation of Accused.*

In either civil or criminal cases, when the genuineness of a writing
is in issue, other writings admitted or proved to be genuine may
be received in evidence and submitted to the jury for the purpose
of comparison, though otherwise immaterial.

In a murder trial involving the issue whether inscriptions carved on
certain doors in capitals like print were cut by respondent, writings,
the acknowledged work of respondent, done in ordinary writing,
contained in memorandum books and letters, and having dates
that were punctuated exactly like those in the inscriptions, were
admissible to show his habit in that regard.

If a writer invariably makes the same mistake, or always adopts the
same of two or more legitimate methods that present substantial
differences, such practice is a circumstance that makes his genuine
writings available to establish the genuineness of a disputed one.

In a murder trial involving the question whether the inscriptions ·
"E. Kent", and "E. K", carved on doors in capitals like print,
were cut by the respondent, a lawn mower handle on which was
the inscription "E. Kent", also in capitals like print, done in pencil
and the acknowledged work of respondent, is admissible in evidence
to show that the carved inscriptions were cut by him, where the
letters common to all the inscriptions are substantially alike and
show the same marked peculiarities of construction.

In a murder trial, respondent's carved initials on the door of a barn
near the house in which the murder was committed, was properly
admitted in evidence to connect respondent with the crime, as
against the objection that there was nothing to connect him with
it, where the evidence tended to show that respondent admitted
he slept in the barn the night before the crime, and to show that

he had a habit of cutting his initials as a pastime, and that fresh whittlings were found on hay beneath the carving where someone had lain.

Where a person's handwriting is to be proved by the testimony of one who has seen him write, and so has in mind a standard whereby to test the writing in question, it is sufficient if the witness has seen the person write once, though it were years before, and then only saw him make his signature.

Where the acknowledged writings of a respondent are admitted to prove by comparison that he carved certain inscriptions on a door, that the evidence afforded by the comparison is not conclusive does not affect its relevancy, but only its weight.

INDICTMENT for murder. Plea, not guilty. Trial by jury at March Term, 1909, Rutland County, *Waterman,* J., presiding. Verdict, guilty of murder in the first degree, and judgment thereon. The respondent excepted. The opinion states the case.

*John G. Sargent,* Attorney General and *Joseph C. Jones,* State's Attorney, for the State.

*Ernest H. O'Brien* for the respondent.

MUNSON, J. The respondent stands convicted of the murder of Delia Congdon, who lived alone in the east part of Wallingford, and whose body was found in her house about noon on the twenty-fourth day of July, 1908, in a condition which indicated that she had been ravished, and with several deep cuts upon the head. The respondent escaped from the State hospital for the insane at Waterbury on the eleventh of July, was seen in the east part of Wallingford by several persons between the eleventh and twenty-fourth, and was arrested at Pittsfield, Mass., in the following October. There was evidence that he was seen on the twenty-second of July, about three miles from the Congdon house, at a deserted building known as the Monadnock Club house; and that on the twenty-sixth there was found carved on a door in the Buffum house, a deserted building about three-fourths of a mile from the club house, the following date: ''July. 22. 1908'', and below it the name ''E. Kent'', each punctuated as shown. The barn on the Congdon place stood within a

hundred feet of the house, with the side containing the double doors facing the window of Miss Congdon's bedroom. There was no evidence that the respondent had been seen in the immediate vicinity of the Congdon house; but there was evidence of his having stated that he passed the night of the twenty-third in the Congdon barn, and that he saw the deceased through a crack in the barn door when she got up, and that he went there for that purpose. There was also evidence that some new hay had been put on the barn floor on the twenty-second of July, and that on the twenty-sixth the letters "E. K", punctuated as shown, were found carved on the inner side of the barn door, and that some freshly whittled shavings of the same kind of wood as the door were found on the hay directly beneath the carving, and that a little further back from the door there was a hollow in the hay which looked as though someone had lain there. There was also the testimony of an officer that in pursuing his investigations he had found the letters E. K. cut in several places in other towns, and that he afterwards told the respondent about his finding these cuttings and where he had found them, and that the respondent said he had been to those places and cut his initials there.

The State introduced in evidence a piece of wood, taken from the handle of a lawn mower used at Waterbury, on which there was printed with a lead pencil the name "E. Kent", in capital letters and punctuated as shown. The State also introduced a memorandum book, which contained many entries of dates in September and October, 1908, and a letter bearing date October 23, 1908, addressed to the superintendent at Waterbury; both of which were in the respondent's possession at the time of his arrest. All these writings are the unquestioned work of the respondent, and no objection was made to their admission. The State then offered sections taken from the Buffum and Congdon doors, on which were the cuttings above described. The defence objected to the admission of these on the ground that there was nothing in the case to connect the respondent with them, but the court received them and the respondent excepted. It is now urged in support of the exception that the handwriting of a person affords no standard of comparison that can justify the admission of carved letters or numerals on the ground of

similarity. The question thus raised is the only one in the
case.

It is not necessary to trace the uncertain steps by which the
law of this subject reached its present state, nor to consider the
varied holdings which prevail in different jurisdictions. It has
long been the settled doctrine of this State that when the genu-
ineness of a writing is in question, other writings admitted or
proved to be genuine may be received and submitted to the jury
for the purpose of comparison, although not otherwise material
to the issue. *Adams* v. *Field,* 21 Vt. 256. The law formerly
confined this proof to civil cases, but our Court has allowed it in
criminal cases also, and this practice is now almost universal.
*State* v. *Ward,* 39 Vt. 225; Wig. §1991 n. 11; 1 Best Ev. *347.
It has been doubted whether signatures made by a cross are
capable of proof by comparison, but the evidence has been al-
lowed in cases where some marked peculiarity of the character
could be pointed out. Note 65 L. R. A. 95; See *Sanborn* v.
*Cole,* 63 Vt. 590, 22 Atl. 716, 14 L. R. A. 208. We know of no
case in which the evidentiary effect of punctuation marks has
been passed upon; but learned writers have spoken of the use
made of them as one of the means for testing the authenticity of a
writing. 1·Green. §581, note b.

All the letters in the carved inscriptions are like the capitals
of print, while the capitals contained in the book and letter are
those of ordinary handwriting. The numerals contained in the
Buffum house inscription are repeated many times in the book;
but it is urged that there can be no fair comparison between them
because of the difference in the tools and ·methods employed in
making them. Passing these matters wherein the genuine and
disputed writings differ, we take up the method of punctuation,—
a feature of the writings to which the objection just stated has
no application. The memorandum book contains on different
pages fifteen complete dates in regular form, and the letter has
two more, making a total· of seventeen, in all but one of which
the name of the month is abbreviated. One of the entries is
entirely without punctuation. All the others have a period after
the month, a period after the day of the month, and no mark
after the year; with the possible exception of a period after the
year in one instance where the nature of an indistinct mark
cannot be determined. So we have in the conceded writings an

entire uniformity in the manner of punctuating a full date, which corresponds with the method employed in the carved date in question; and this uniform practice includes an omission of the period at the end of the entry.

It may be said that the period after the month is called for by the abbreviation, that some punctuation mark is needed to separate the figures representing the day of the month from those designating the year, and that there is no necessity for a period at the close of the entry. In view of these possible suggestions a further examination of the dates is advisable. The month named in the excepted instance is July, which is the month named in the Buffum house inscription; and in both instances the word is followed by a period, as in the cases of abbreviation. Moreover, the book contains forty consecutive entries giving the day of the week in unabbreviated form, and the figures designating the day of the month, but without the year being given; and in almost every instance the name of the day is separated from the figures by a period. This indication of the respondent's tendency to make a free and unnecessary use of the period in writing dates, renders its invariable or almost invariable omission at the end of a completed date a noticeable trait. It may be said further with reference to the incomplete dates, that while there are a few entries at the commencement of the series in which the figures giving the day of the month are followed by a period, the list concludes with twenty-nine consecutive entries in which the line closes without a period, as in the case of the completed dates. It is manifestly the habit of the writer to use the period as a mark of separation and not as a terminal character.

It will be noticed that this is not strictly a comparison of handwriting. It is rather the proof of a habit regarding the use of a character which, as ordinarily made and as made in this case, affords no opportunity for the development of individual characteristics capable of detection. This branch of the law of the subject is well recognized, and may be illustrated by the proof arising from the misuse of capitals or habitual mistakes in spelling. If a writer invariably makes the same mistake, or always adopts the same of two or more legitimate methods which present substantial differences, his practice therein is a circumstance which makes his genuine writings available to establish the authenticity of a disputed one. In this case we

have an entry of sufficient scope to admit of several variations, repeated a sufficient number of times to constitute a fair test, and almost complete uniformity. The question here is not whether the character is similar in appearance, but whether it is present or absent in this or that particular place.

It remains to examine that part of the inscription which consists of the respondent's name, and the letters E. K. found on the Congdon barn door, in connection with the respondent's name as printed on the handle of the lawn mower. The letters involved in this inquiry are all in the style of type-printed capitals. The objection based on the difference in the tools employed to make the acknowledged and disputed characters has less importance than might attach to it in some cases, from the fact that the letters to be compared are composed entirely of straight lines. We have two letters E in the acknowledged inscription and three in the disputed ones. It is noticeable that all of them are narrow in proportion to their length, and as compared with the other letters. The three letters K are substantially alike, except that the lower diagonal line on the lawn mower was prolonged until the pencil ran off the wood. They are peculiarly constructed, in that the diagonal lines leave the upright line at an angle that would require a greatly disproportionate length to bring the outer ends in line with the ends of the upright line,—while, with the exception mentioned, the extension is very much less. Both the pencilled N and the carved one are much shorter than the other letters, and are like each other, and different from the rest, in respect to the slant given them. We think the peculiarities noted are such as justify the comparison, notwithstanding the difference in the methods of inscribing.

But the respondent's connection with the carving in the Congdon barn does not depend entirely upon the similarity of letters. The evidence of the respondent's admission that he passed the night of the twenty-third in this barn, the evidence tending to show a practice of cutting his initials as a pastime, the evidence that the hay was thrown upon the barn floor on the twenty-second and that fresh whittlings were found on this hay just below the carving, were evidence tending to show that the respondent made the letters. In this state of the evidence the fact that the letters were there, without proof of the hand-

writing, would be evidence confirmatory of the testimony of the witness regarding the respondent's admission. The exception to each exhibit was put upon the ground that there was nothing in the case to connect the respondent with it, and as against this objection the exception to the admission of the barn exhibit could be overruled on the ground just considered. But we give the exception the scope it was doubtless intended to have, and make no distinction between the two exhibits in our treatment of the case.

It cannot be said that the evidence afforded by a comparison of these exhibits with the acknowledged writings was too inconclusive to justify their admission. The question is not one of conclusiveness but of relevancy. The holdings upon another branch of the subject may properly be considered in this connection. When the handwriting of a person is to be proved by the testimony of one who has seen him write, and so has in mind a standard by which to test the writing in question, it is sufficient if the witness has seen the party write once, even though it were years before, and although the writing was only his signature. 1 Best Ev. *327; *Re Diggins' Est.*, 68 Vt. 198, 34 Atl. 696; *Redding* v. *Redding's Est.*, 69 Vt. 500, 38 Atl. 230. When the handwriting of a person is to be proved by one who has acquired a knowledge of the handwriting in question through a correspondence carried on in circumstances which justified a belief that the letters received were from such person and in his hand, it is said that the number of letters or the quantity of writing which the witness may have received is entirely immaterial as far as the admissibility of the evidence is concerned. 1 Best Ev. *329; Wig. §707. In either of these cases, the witness may be a person of less than ordinary experience and intelligence in the use and observation of handwriting. Writers have often commented on the uncertainties attending evidence of this character, but its admissibility remains unquestioned. So when the genuineness of a writing is to be determined by the jury from a comparison with exhibited and conceded standards, the basis of comparison may be slight and yet be adequate in law. We are satisfied that the acknowledged writings of the respondent afforded a basis of comparison with the disputed inscriptions which made the latter relevant to the inquiry, and it is certain that we have no rule that requires the exclusion of

relevant evidence for lack of weight. The evidence was admissible; its weight was for the jury; and it is to be presumed that the jury were aided in their consideration of it by suitable instructions.

*Judgment that there was no error in the proceedings and that the respondent take nothing by his exceptions.*